UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------------------------
IN RE:

    JAIME M. PETROCCI          CASE NO. 06-34191
    LOUIS M. PETROCCI, III

                  Debtors      Chapter 13

---------------------------------------------------------
IN RE:

    WILLIAM F. DE LEE         CASE NO. 06-34294
    TARA A. GRAHAM
    a/k/a TARA A. GRAHAM DE LEE

                  Debtors      Chapter 13

---------------------------------------------------------
IN RE:

    OCTAVIA CANNON         CASE NO. 06-34115

                  Debtor      Chapter 13

---------------------------------------------------------
APPEARANCES:

MARK W. SWIMELAR, ESQ.
Chapter 13 Trustee
250 South Clinton Street, Suite 203
Syracuse, NY 13202

BODOW LAW FIRM, PLLC      THEODORE L. ARAUJO, ESQ.
Attorneys for Jaime & Louis Petrocci, III    Of Counsel
Attorneys for William De Lee and Tara
  Graham-DeLee
Attorneys for Octavia Cannon
1925 Park Avenue
Syracuse, New York 13208

DEILY, MOONEY & GLASTETTER, LLP    MARK D. NIZER, ESQ.
Attorneys for Hyundai Motor Finance Company  Of Counsel
8 Thurlow Terrace
Albany, New York 12203

2

NASTO LAW FIRM                          MICHAEL B. RASMUS, ESQ.
Attorneys for AmeriCU Credit Union      Of Counsel
AmeriCU Credit Union Bldg.
4957 Commercial Drive
Yorkville, NY 13495

HELFAND & HELFAND                       CHRISTIAN H. DRIBUSCH, ESQ.
Attorneys for Nuvell Credit Corporation Local Counsel
60 East 42nd Street                     5 Clinton Square
Suite 1048                              Albany, New York 12207
New York, NY 10165

Hon. Stephen D. Gerling, Chief U.S. Bankruptcy Judge

## MEMORANDUM-DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

Under consideration by the Court are three contested matters resulting from three separate

objections to the Chapter 13 Plans of Louis and Jamie Petrocci, Octavia Cannon, and William

DeLee and Tara Graham-DeLee. Each of the objecting secured creditors (Hyundai Motor Finance

Co., Nuvell Credit Corp., and AmeriCU Credit Union, collectively "Creditors") in the three cases

treated in this Decision (Petrocci, Cannon, and DeLee/Graham-DeLee, collectively "Debtors")

objected to the Debtors' plans on the ground that those plans did not provide for the payment in

full of the Creditors' claims mandated by the so-called "hanging paragraph" of § 1325 (a)(9) of

the Bankruptcy Code (11 U.S.C. §§ 101 -1330) ("Code").[1]

Because these objections involve a determination of nearly identical issues, the Court has

consolidated the cases for purposes of oral argument and decision.

---

[1] The Code as referenced herein is the Bankruptcy Abuse Prevention and Consumer
Protection Act of 2005 ("BAPCPA") effective October 17, 2005.

Hyundai Motor Finance Co. ("Hyundai") filed an objection to Petrocci's plan on October 17, 2006, and filed its Memorandum of Law supporting that objection on January 19, 2007.  The Petroccis filed their Memorandum of Law in support of their plan's treatment of Hyundai's claim on January 19, 2007 as well.

Nuvell Credit Corp. ("Nuvell") filed its objection to Cannon's plan on September 27, 2006, and filed a Memorandum of Law supporting that objection on January 19, 2007.  Cannon filed her Memorandum of Law in support of her plan's treatment of Nuvell's claim on January 19, 2007 as well.

AmeriCU Credit Union ("AmeriCU") filed its objection to DeLee/Graham-DeLee's plan on December 29, 2006.  It did not submit a supporting Memorandum of Law.  Nor did the Debtor.

The Court heard oral argument on all three matters on January 23, 2007, and gave the parties until February 1, 2007 to submit any additional Memoranda of Law.  Accordingly, the Court will consider the matter submitted for decision as of February 1, 2007.

## JURISDICTIONAL STATEMENT

_____The Court has core jurisdiction over the parties and subject matter of this contested matter pursuant to 28 U.S.C. §§1334, 157(b)(1) and (b)(2)(B),(K), (L) and (O).

4

## FACTS

### Petrocci

On June 28, 2005, Louis M. Petrocci, III and Jaime M. Petrocci ("Petroccis") purchased a 2005 Hyundai Sonata from Fucillo Hyundai of Syracuse.  The retail installment contract ("Hyundai Contract") executed by the Petroccis with Hyundai Motor Finance Co. showed a vehicle price of $18,515.48.  The amount financed, after some calculations allowing for a manufacturer's rebate and the trade-in of their existing vehicle, and before dealer fees, was $21,820.84.  This was due primarily to the fact that the trade-in allowance of the Petroccis' existing vehicle, a 2003 Hyundai Tiburon, was $11,273.00, while the loan balance still remaining to be paid on the vehicle was $17,328.36.  What the Hyundai Contract referred to as the resulting "net trade-in" of a negative $6,055.36 was then reduced by a manufacturer's rebate of $2,750.00.  The resulting negative $3,305.36 was denoted on the Hyundai Contract both as a "net cash trade-in" and as an additional "amount to finance" to be added to the vehicle price.  This $3,305.36 represents the so-called "negative equity."

The Petroccis filed a Chapter 13 bankruptcy petition on October 5, 2006.  In their Chapter 13 Plan, they took the $19,671.28 loan balance as of the date of filing, and reduced it by the $6,055.36 the Hyundai Contract denoted as "net trade-in."  The Petroccis referred to this $6,055.36 amount as the "non-purchase money added to contract for negative trade-in."  The resulting $13,615.92 is the value the Petroccis chose to pay off as a secured claim in their Chapter 13 Plan, rather than the full amount of the loan as of the date of filing, or the current market value of the 2005 Hyundai Sonata.

Hyundai filed an Objection to Confirmation of the Petroccis' Plan on October 17, 2006, alleging that the hanging paragraph of Code § 1325(a)(9) precludes the Petroccis from using Code § 506(a) to bifurcate or "cram down" Hyundai's claim.

**Cannon**

Octavia Cannon ("Cannon") filed a Chapter 13 bankruptcy petition on September 12, 2006. On July 29, 2004, Cannon had purchased a 2004 Saturn Ion from Saturn of Route 31 in Liverpool, N.Y. The retail installment contract ("Saturn Contract") executed by Cannon with the dealership, assigned to Nuvell Credit Corporation ("Nuvell") on August 4, 2004, showed a vehicle price of $18,221.51. The amount financed, after allowing for the trade-in of her existing vehicle, was $22,327.88. This was due primarily to the fact that the trade-in allowance of Cannon's existing vehicle, a 2000 Jeep Cherokee, was $9,495.59, while the loan balance still remaining to be paid was $15,067.51. What the Saturn Contract referred to as the resulting "net trade-in" of a negative $5,571.92 was then reduced by a credit of $3,000.00. After dealer service and documentation fees, the amount financed exceeded the price of the new car by $4,106.37.

In her Chapter 13 Plan, Cannon took the $19,144.88 loan balance as of the date of filing, and reduced it by the $5,571.92 the Saturn Contract referred to as "net trade-in." Cannon referred to this $5,5571.92 amount as "not part of purchase money consideration" and deducted it from the $19,144.88 loan balance to arrive at the $13,572.90 Cannon chose to pay through her Chapter 13 Plan as a secured claim, rather than the full amount of the loan as of the date of filing, or the stated $7,620.00 current market value of the 2004 Saturn.

Nuvell filed an Objection to Confirmation of Cannon's Plan on September 21, 2006,

6

alleging that the Plan did not meet the requirements of the "910 day rule" of the hanging

paragraph of Code § 1325(a)(9) because it did not provide for payment of Nuvell's claim in full.

**DeLee/Graham-DeLee**

William and Tara DeLee/Graham-DeLee ("DeLee/Graham-DeLee") filed a Chapter 13

bankruptcy petition on November 7, 2006.  On June 3, 2006 DeLee/Graham-DeLee had purchased

a 2001 Cadillac Deville from Romano Motors, Ltd. in Fayetteville, N.Y.  The retail installment

contract ("Romano Contract") executed by DeLee/Graham-DeLee with the dealership (later

assigned to AmeriCU) showed a vehicle price of $20,449.58.  The amount financed, after taking

into account the trade-in of DeLee/Graham-DeLee's existing vehicle, a 1999 Chrysler Concorde,

was $22,941.91.  This was due primarily to the fact that the trade-in allowance of DeLee/Graham-

DeLee's existing vehicle was $5,969.00, while the loan balance on that vehicle still remaining to

be paid (to AmeriCU) was $9,767.33.  The resulting $3,798.33 in negative equity, although not

expressly listed on the Romano Contract, was added to the amount to be financed.

In their Chapter 13 Plan, DeLee/Graham-DeLee took the Kelley Blue Book value on the

2001 Cadillac Deville of $7,965.00 as the amount to be paid as a secured claim in the Plan, rather

than, as Petrocci and Cannon did, the loan balance as of date of filing less the negative equity,

which in DeLee/Graham-DeLee's case would have been $19,302.48 less $3,798.33, or

$15,504.15.[2]

_____

[2] The reason for this disparity is that the Debtors' counsel in the *Petrocci* and *Cannon*
cases assumed the Court would find that the financing transactions were "mixed" transactions
containing both purchase money and non-purchase money components, and find that the "Dual
Status" rule applied, thus, granting the secured creditor a purchase money security interest in the
collateral to the extent of the loan less the negative equity.  In the *Delee/Graham-DeLee* case,
counsel assumed that the Court, after finding that the transaction was "mixed," would apply the
"Transformation" rule, which destroys the creditor's purchase money security interest entirely,

AmeriCU filed an Objection to Confirmation of DeLee/Graham-DeLee's Plan on December 29, 2006, claiming that the Plan did not meet the requirements of the 910 day rule of the hanging paragraph of Code §1325(a)(9) because it did not provide for payment of AmeriCU's claim in full.

## ARGUMENT

### Debtors' Argument

The Debtors' argument in each of these three cases, as set out in Petroccis' and Cannon's January 19, 2007 Brief in Response to the Objection of Creditor ("Debtors' Brief") is little more than the assertion that this Court should follow the opinion and analysis of the court in *In re Peaslee*, 358 B.R. 545 (Bankr. W.D.N.Y. 2006), as well as the argument contained in the Western District of New York, Rochester Division, Chapter 13 Trustee's Brief in support of his Section 506 Motion ("Chapter 13 Trustee's Brief") in *In re Phillips*, Case No. 21242, (Bankr. W.D.N.Y. November 3, 2006). In fact, counsel for Petroccis and Cannon append, as exhibits, copies of both the *Peaslee* decision and the Chapter 13 Trustee's Brief (which the Chapter 13 Trustee also appended to his November 9, 2006 Reply to Creditors' Briefs in the *Peaslee* case) to their twenty-eight line Debtors' Brief.[3]

---

leaving the creditor secured only to the extent of the value of the vehicle. The Court followed neither course. *See* this Decision's Discussion section, *infra*.

[3] Because the vast majority of the arguments in the Chapter 13 Trustee's Brief are addressed in the *Peaslee* decision, this Court will refer exclusively to the *Peaslee* decision.

### *In re Peaslee*

In *Peaslee*, United States Bankruptcy Judge John Ninfo faced the same fact pattern as in the instant cases.

At issue was whether the hanging paragraph of Code § 1325(a)(9), which prevents the Code §506(a) bifurcation of a secured creditor's claim, in certain circumstances, applies if a secured lender finances "negative equity" from a buyer's previous vehicle loan along with the price of the new vehicle.  The hanging paragraph of Code § 1325(a)(9) reads, in relevant part:

> For purposes of paragraph (5), *section 506 shall not apply* to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [period] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor...

Code § 1325(a)(9) (emphasis added).

Thus, the hanging paragraph applies if the four requirements contained therein are met:

1. The creditor has a purchase money security interest in the vehicle;
2. The debt was incurred in the 910 days before the debtor's petition date;
3. The collateral for the debt consists of a motor vehicle; and
4. The motor vehicle was acquired for the personal use of the debtor.

The *Peaslee* debtor's auto loan ostensibly fell within the purview of the hanging paragraph of Code § 1325(a)(9).  The car was purchased within the 910 days preceding the filing, the creditor allegedly had a purchase money security interest in the vehicle, which was acquired for personal use.  As such, Code § 506(a) would not apply to this debt, and the debtor would be unable to bifurcate the debt into secured and unsecured portions.

The *Peaslee* Chapter 13 Trustee, however, submitted a valuation motion which asserted

9

that $5,980 of negative equity from the debtor's trade-in was rolled into the new loan, which meant that the creditor had a purchase money security interest in only a portion of the debt. The *Peaslee* court found that as a result the Code § 1325(a)(9) hanging paragraph exception did not apply, and the creditor's claim was subject to the Code § 506 bifurcation.

Bankruptcy Judge Ninfo examined the hanging paragraph and found that it required "that the debt included in the claim must be secured by a purchase money security interest, so that if all of the debt included in the claim is not so secured, the exception provided in the [hanging paragraph] is not applicable." *Peaslee*, 358 B.R. at 556. The court arrived at this conclusion by looking to New York Uniform Commercial Code Law ("UCC") § 9-103 for the definition of purchase money security interest because this term is not defined in the Code.

UCC § 9-103(a)(2) defines purchase money obligation as "an obligation of an obligor incurred *as all or part of the price* of the collateral or for value given *to enable the debtor* to acquire rights in or the use of the collateral if the value is in fact so used." (emphasis added).

The *Peaslee* court focuses on the definition of the term "price" in UCC §9-103. In fact, it bases its holding largely on its conclusion that because the "price" used by the secured creditor includes the negative equity from the previous loan, it exceeds what the *Peaslee* court calls "the actual price of the collateral being acquired."[4] *Id.* *Peaslee* concludes that "price" should not include negative equity because the word "price" in this context "*has the same meaning that it has always had* in connection with transactions for the acquisition of any collateral, including a motor vehicle, *which is the actual price of the collateral being acquired.*" *Id.* (emphasis added).

---

[4] The Court assumes that by "actual price" the *Peaslee* court means the list price of the financed vehicle, but this remains unclear.

This is relevant because if the creditor can define "price" to be the price that appears on the face of the installment contract (which includes the negative equity), then the creditor can argue that it does in fact have a purchase money security interest in all or part of the collateral, and, thus, the hanging paragraph exception to Code § 506(a) applies.  But according to *Peaslee*, negative equity is not part of the "actual price of the collateral" and, thus, cannot be part of the "price" referred to in UCC § 9-103.

The *Peaslee* court found that the inclusion of negative equity also runs afoul of the UCC § 9-103(a)(2) definition of a purchase money obligation because it is not "value given *to enable the debtor* to acquire rights in or the use of the collateral..." UCC § 9-103(a)(2) (emphasis added). Here the court looked to Comment 3 to UCC § 9-103, which provides the following as examples of "value given to enable..." (as well as components of "price" in the purchase money context):

> obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, *and other similar obligations*.

Comment 3 to UCC § 9-103 (emphasis added).

The court found that negative equity financing, especially because the majority of vehicle buyers do not roll in negative equity, would not qualify as one of the "other similar obligations" referred to in the Comment.[5]  Hence, negative equity could not qualify as "value given to enable" the debtor to purchase the collateral, or as part of the "price" of the collateral, and so therefore could not qualify as part of a purchase money security interest [or obligation].  And with the negative equity portion of the financed amount preventing the entire amount from comprising a

---

[5] The *Peaslee* court notes that between 26% and 38% of all car buyers have negative equity in their trade-in vehicles. *Peaslee*, 358 B.R. at 554.

purchase-money security obligation, the *Peaslee* court found that the secured lender's entire claim was not secured by a purchase money security interest.

Bankruptcy Judge Ninfo viewed the financing of a new car and the negative equity on the buyer's trade-in as "simply *two separate financial transactions* memorialized on a single retail installment contract..." *Peaslee*, 358 B.R. at 558 (emphasis added): one for the purchase of the collateral, the other to refinance the negative equity in the buyer's trade-in vehicle. From this premise Judge Ninfo concludes that the "transaction" which refinanced the negative equity "does not result in a purchase money obligation and the resulting security interest taken for that debt is not a purchase money security interest." *Id*.

The *Peaslee* court also analyzed the issue from a historical perspective and found more reasons to support its finding that negative equity does not merit protection by or classification as purchase money security interest:

> This Court agrees with the Trustee that, given the history of the development of the Bankruptcy Code, there does not appear to have been a legal or equitable reason that Congress would have enacted a provision that would transform knowingly refinanced unsecured negative equity debt into secured debt not supported by collateral value, and then require it to be paid in full to the detriment of other unsecured creditors. This would undermine one of the fundamental policies of the Bankruptcy Code, which is equality of distribution among like creditors.

*Id.* at 556.

## Creditors' Argument

## Hyundai Motor Finance Co.

Hyundai argues that the Code does not define the term "price" as it is used in UCC §9-103, and that UCC § 9-103 is sufficiently flexible to allow consideration of another state law

12

definition of price.  For this purpose, Hyundai turns to the definition of "cash sale price"

contained in New York's Motor Vehicle Retail Installment Sales Act found in Article 9 of the

N.Y. Personal Property Law ("MVRISA").  MVRISA defines cash sale price as

> the cash sale price stated in a retail installment contract for which the seller would
> sell to the buyer, and the buyer would buy from the seller, the motor vehicle which
> is the subject matter of the retail installment contract if the sale were a sale for
> cash instead of a retail installment sale. The cash sale price may include any taxes,
> registration, license and other fees and charges for insurance, for accessories and
> their installation and for delivering, servicing, repairing or improving the motor
> vehicle and for other services incidental to the agreement. *It also may include the
> unpaid balance of any amount financed under an outstanding motor vehicle loan
> agreement or motor vehicle retail installment contract or the unpaid portion of
> the early termination obligation under an outstanding motor vehicle retail lease
> agreement.*

MVRISA § 301(6) (McKinney 2006) (emphasis added).

Hyundai also cites to *In re Graupner*, 356 B.R. 907 (Bankr. M.D. Ga. 2006).  The

*Graupner* court found that the definition of "cash sale price" in the Georgia Motor Vehicle Sales

Finance Act ("GMVSFA") (which is very much like that found in the MVRISA) could be applied

to the Code § 1325(a)(9) hanging paragraph situation.  *Graupner* reasoned that because the

GMVSFA related to the same subject matter as UCC § 9-103, and because the court found that

the meaning of the word "price" in UCC 9-103 was ambiguous ("not clear from a plain reading

of the statute." *Id.* at 919), the two statutes should be read *in pari materia*, i.e., "construed

together and harmonized where possible." *Id.*   As a result, the *Graupner* court found that

inclusion of negative equity did not destroy the purchase-money nature of the secured creditor's

claim. *Id*. at 923.

Hyundai argues that the New York State legislature's deliberate inclusion in the MVRISA

of negative equity as a component of a vehicle's "cash sale price" supports the view that the

13

financing of the list price of the new car, along with the negative equity of the debtor's trade-in

vehicle, is a single transaction by which the debtor acquires rights in the collateral/vehicle.  It

contends that the *Peaslee* court's conclusion that MVRISA "[was] enacted to insure adequate

financial disclosure in consumer transactions or for other unrelated reasons" (*Peaslee*, 358 B.R.

at 556) is needlessly restrictive and irrelevant and is no justification for ignoring its definition of

cash sale price.  *See* Hyundai Memorandum of Law, p. 7.

Hyundai also cites *General Electric Capital Commercial Automotive Finance, Inc. v.*

*Spartan Motors, Ltd.*, 246 A.D.2d 41 (2d Dept. 1998).  According to Hyundai, the *Spartan*

*Motors* court, while examining UCC § 9-107, the precursor to the current UCC § 9-103, found

that "New York Courts have consistently looked to the intention of the parties in association with

the transaction involved and have considered the conditions and circumstances confronting the

parties when the contract was made and whether the availability of the loan was a factor in

negotiating the sale."  Hyundai Memorandum of Law, p.6 (citation omitted).

Hyundai contends that the *Peaslee* decision's holding that the "price of the collateral" as

used in UCC § 9-103(a)(2) is limited to the collateral being acquired and nothing more "is in

direct opposition to Official Comment 3 to UCC § 9-103,[6] which contemplates that other items

---

[6] Comment 3 to UCC § 9-103 reads, in relevant part:

The concept of "purchase-money security interest" requires a *close nexus* between
the acquisition of collateral and the secured obligation. Thus, a security interest
does not qualify as a purchase-money security interest if a debtor acquires
property on unsecured credit and subsequently creates the security interest to
secure the purchase price.

N.Y. UCC Law §9-103 Comment 3. (McKinney 2006) (emphasis added).

with a nexus to the collateral will be included without destroying the purchase-money status."

Hyundai Memorandum of Law, p.7.  Hyundai also argues that *Peaslee* did not address the "close

nexus" language of Comment 3, or the related "closely allied" analysis of *Spartan Motors*,

because each of these argues for the financing of negative equity not disturbing the creditor's

purchase money security interest in the collateral.  Hyundai also argues that even if *Peaslee*'s

characterization of the transaction financing the new car and negative equity were to be viewed

as two separate financial transactions which should be analyzed separately is correct, it is

irrelevant if both transactions meet the close nexus requirement set out in Comment 3 to UCC §

9-103.

Hyundai argues that if a New York State court were to construe or define purchase money

security interest as the *Peaslee* court has, transactions involving negative equity "would not

qualify for the automatic perfection status afforded by Section 2118 of the New York Vehicle and

Traffic Law."  Hyundai Memorandum of Law, p. 8.

## Nuvell Credit Co., LLC

Nuvell argues that the reasoning in *Graupner* should be applied to the instant case because

"the Georgia statutes interpreted in [*Graupner*] are identical to the applicable New York statutes."

Nuvell Memorandum of Law, p.7.

Nuvell makes the same argument Hyundai does: that the *Peaslee* court's failure to take

into account MVRISA's definition of cash sale price was error.  Nuvell contends that because

MVRISA establishes the requirements and prohibitions as to retail installment contracts,

> [t]hat the legislators contemplated and may even have intended the interplay
> between the Code and [the MVRISA] is not novel. *Bankruptcy courts regularly*

*consult state motor vehicle and traffic laws to determine issues regarding perfection of security interests in goods as well as vehicles.*

Nuvell Memorandum of Law, p.9 (emphasis added).

Nuvell contends that it is inevitable that MVRISA would have some "overlap" with the UCC. As a result, Nuvell asserts that there is no reason a court should not be able to look to MVRISA's definition of a term included, but not precisely defined, in either the Code or the UCC.


**AmeriCU Credit Union**

AmeriCU Credit Union merely objected to DeLee/Graham-DeLee's Plan, alleging a violation of the hanging paragraph of Code § 1325(a)(9). It did not file any Memorandum of Law.


## DISCUSSION


At issue in each of the three cases under consideration is whether the hanging paragraph of Code § 1325(a)(9), which prevents the Code § 506 bifurcation of a secured creditor's claim in certain circumstances, applies if a secured lender finances "negative equity" from a buyer's previous vehicle along with the price of the new vehicle.

As mentioned in the argument section of this Decision, the *Peaslee* court interprets the word "price" in the language contained in the UCC § 9-103 definition of a purchase money

16

obligation "*incurred as all or part of the price of the collateral* " not to include negative equity.[7]

As a result, the *Peaslee* court finds that the creditor's claim is not secured by a purchase money

security interest as required by the hanging paragraph to Code §1325(a)(9), so that the hanging

paragraph exception to Code § 506 does not apply.

Peaslee first posits that "price" does not include negative equity because the word "price"

in this context "*has the same meaning that it has always had* in connection with transactions for

the acquisition of any collateral, including a motor vehicle, *which is the actual price of the

collateral being acquired*."  *Peaslee*, 358 B.R. at 556 (emphasis added).  This conclusion is not

found in any supporting case law that the Court was able to find.[8]

A second problem with the *Peaslee* court's conclusion that "price" "has the same meaning

that it has always had...which is the actual price of the collateral being acquired" (*Id*.) is that

Comment 3 to UCC § 9-103 directly contradicts it.  Comment 3 clearly states that "price"

---

[7] UCC § 9-103(a) reads:

(1) "purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral; and
(2) "purchase-money obligation" means an obligation of an obligor incurred as all or part of the *price of the collateral* or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.

UCC § 9-103(a) (McKinney 2006) (emphasis added).

[8] Hyundai's argument that "[t]he purchase price included all amounts financed as a part of the contract which enabled the debtor to purchase the new vehicle" (Hyundai Memorandum of Law, p.8) at least has some support in the case law. *See, e.g., In re Johnson*, 337 B.R. 269 (Bankr. M.D.N.C. 2006) (although the retail instalment contract included a $1,095.00 service contract, creditor was not secured by more than the vehicle and the court held that the hanging paragraph of Code § 1325(a)(9) applied); *see also In re Murray*, 346 B.R. 237 (Bankr. M.D. Ga. 2006) (financing of an extended service contract and documentary fee along with the new vehicle does not prevent a creditor from taking a purchase money security interest in the vehicle).

> includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, *and other similar obligations*.

Comment 3 to UCC § 9-103 (emphasis added).

Thus, the Official Comment 3 to UCC § 9-103, in a rather wide-ranging and open-ended attempt to define "price" in the purchase money security interest context, explicitly states that the "price" of the collateral may include much more than what the *Peaslee* court calls "the actual price of the collateral being acquired." This makes it difficult to accept the *Peaslee* court's conclusion that the word "price" as used in UCC § 9-103 "has the same meaning that it has always had...which is the actual price of the collateral being acquired." *Peaslee* 358 B.R. at 556. And at bottom it is this premise which anchors the holding in *Peaslee*.[9]

As if to counter Comment 3's direct contradiction of its conclusion that actual price is all that matters in the purchase money security interest context, the *Peaslee* court then opines that negative equity "is not the kind of expense included in the price of Section 9-103(a)(2), as contemplated by Comment 3 to Section 9-103." *Id.* at 557. As support for this determination, *Peaslee* offers the statement that negative equity of a trade-in vehicle "is not the kind of incidental and directly related expense, such as taxes and license and registration fees, contemplated by Comment 3, especially when that negative equity can be $10,000.00, $15,000.00 or more." *Id.* at 557-58.

There are several problems with this reasoning. The first is the conclusory nature of its premise that negative equity is "not the kind of *incidental and directly related* expense...

---

[9] This conclusion also suffers from the lack of a definition for the term "actual price."

contemplated by Comment 3." *Id.* (emphasis added).  This conclusion is merely a reiteration (but for the words "incidental and directly related") of the *Peaslee* decision's preceding sentence.  The words "incidental and directly related" add nothing to the analysis and are not found in the statute or Comment 3.  If anything, the financing of a car buyer's negative equity in his or her trade-in could easily be characterized as both incidental *and* directly related to the underlying transaction.  But it would not matter whether it could be or not.  The language of the Comment reads "and other similar obligations."  This Court cannot see how negative equity is substantially dissimilar to the interest and finance charges specifically allowed by Comment 3.  Second, Comment 3 makes no mention of absolute or relative prices of the expenses incurred in connection with acquiring rights in the collateral.  The Court can easily envision the "finance charges, interest, freight charges, costs of storage in transit... expenses of collection and enforcement, attorney fees" specifically allowed as components of "price" by Comment 3, in some circumstances comprising a significant amount relative to the value of the collateral itself.  Yet no part of UCC § 9-103 or Comment 3 makes any mention of a dollar limit to these other price components.

The *Peaslee* court also addresses the second definition of a purchase money obligation contained in UCC § 9-103(a)(2), that of an obligation *"incurred... for value given to enable the debtor to acquire rights in* or the use of the collateral if the value is in fact so used." UCC § 9-103(a)(2).  Here the *Peaslee* court simply opines that "providing a loan to refinance negative equity...is not value given to enable that consumer to acquire rights in or the use of the replacement collateral."[10] *Peaslee*, 358 B.R. at 557.  Nuvell makes a more convincing argument

---

[10] Echoing its earlier conclusion regarding the definition of the word "price", the *Peaslee* court concludes that the term "'*enable*' *refers to what it has always referred to*, which is the value given to allow the debtor to pay, in whole or in part, the *actual price* of [the replacement

19

that the financing of negative equity does in fact constitute "value given to enable the debtor to acquire rights in the collateral." Nuvell Memorandum of Law, p. 7. This negative equity financing is inextricably linked to the financing of the new car. It is clear that one would not take place without the other. Such reasoning is in accord with the holdings in *In re Murray* and *In re Johnson*, in which those courts held that the financing of an extended service contract did not destroy the creditor's purchase money security interest because "there is no requirement in [the hanging paragraph] that a creditor be secured *only* by a motor vehicle." *In re Murray*, 346 B.R. 237, 240 (Bankr. M.D. Ga. 2006) (emphasis in original) (citing *In re Johnson*, 337 B.R. 269, 272-73 (Bankr. M.D.N.C. 2006)).

Indeed, one of the *Peaslee* court's supporting factors for its conclusion that negative equity is not "value given to enable" is that a consumer "could pay off the negative equity...by taking loans against credit cards, lines of credit, home equity lines of credit or other facilities, which might even be repayable on more favorable terms." *Peaslee* 358 B.R. at 557 n.12. However, it's obvious that the same could be said for the "freight charges, costs of storage in transit, demurrage, administrative charges..." specifically allowed as part of "price" in this context by Comment 3 to UCC § 9-103. The debtor/purchaser's ability to pay for the expense by some other means would not seem to bear on that expense's status as a component of the "price of collateral." Moreover, this points to another concern with the *Peaslee* court's reasoning: as justification for its conclusion that negative equity is not the "kind of... expense...contemplated by Comment 3..." the *Peaslee* court states that "the majority of customers purchasing motor vehicles do not have to roll-in and refinance negative equity..." *Id.* at 558. The fact that the "majority" of borrowers do not

_____

vehicle]." *Peaslee*, 358 B.R. at 557 (emphasis added).

20

refinance negative equity should not have an effect on whether it is a component of "price of collateral" as outlined in Comment 3 to UCC § 9-103 and UCC § 9-103(a)(2).  Surely the *Peaslee* court does not mean to imply that the majority of car purchasers do, in fact, finance the expenses (allowed as components of "price" by Comment 3) of "costs of storage in transit", "demurrage", "administrative charges" or the "expenses of collection and enforcement." The issues of whether or not negative equity or the charges set out in Comment 3 to UCC § 9-103 are financed by the majority of car purchasers, and/or whether they could be paid in some other manner, would seem to be irrelevant to the matter at hand.

As a reason not to consider MVRISA's definition of "cash sale price" (which specifically includes negative equity) in interpreting the meaning of the term "price" in UCC § 9-103, the *Peaslee* court posits that "[MVRISA was] not enacted in order to define or expand upon the definition of 'purchase money obligation' under the Uniform Commercial Code." *Id.* at 556. This is a rather severe restriction upon a federal court's ability to consult statutes enacted by a state legislature.

*Peaslee* seems to ignore the fact that § 301(5) of the MVRISA defines a Retail Installment Contract as "an agreement...pursuant to which... a security interest in or a lien upon a motor vehicle...is retained or taken by a retail seller from a retail buyer as security...for the buyer's obligation." MVRISA § 301(5).  As the *Graupner* court remarked of very similar language in Georgia's MVSFA, this language/definition "brings its provisions squarely into the realm of relevance when considering the issue of purchase money security interests in the context of a retail instalment sale of a motor vehicle." *Graupner*, 356 B.R. at 921.

For the *Graupner* court, this link was substantial enough for the Georgia MVSFA to be

construed *in pari materia* with UCC § 9-103.  Thus, the word "price" as contained in UCC §9-103 "must be given the meaning set forth in...the [G]MVSFA [which includes the negative equity rolled into the purchase price of the new vehicle]." *Id.* at 923.

New York case law takes a similar view of the *in pari materia* doctrine. "[S]tatutes which relate to the same or to cognate subjects are *in pari materia* and to be construed together unless a contrary intent is clearly expressed by the legislature." *In re Plato's Cave Corp.*, 68 N.Y.2d 791, 793; 498 N.E.2d 420, 421. (N.Y. 1986).  The *Peaslee* court does not explicitly mention the *in pari materia* doctrine.[11] It does, however, argue that MVRISA's definition of cash sales price should not be used to further define the word 'price' as contained in UCC § 9-103 because New York's MVRISA was "not enacted in order to define or expand upon the definition of 'purchase money security interest' under the UCC..." but was, instead, "enacted to insure adequate financial disclosure in consumer transactions or for other unrelated reasons."  *Peaslee*, 358 B.R. at 556. *Peaslee*'s finding that a statute would have to have been enacted specifically "to define or expand upon the definition of 'purchase money security interest' under the UCC" in order to be construed *in pari materia* with UCC § 9-103 flies in the face of a New York Court of Appeals case regarding that doctrine.  *In re Plato's Cave* clearly indicates that statutes need only be "relate[d] to the same or to cognate subjects..." 68 N.Y.2d at 793.   Morever, the *Peaslee* court's characterization of the MVRISA as involving only "adequate financial disclosure" misses the mark.  Even a cursory examination of that statute will reveal, *inter alia*, that it expressly prohibits "the creation of a security interest in any personal or real property, other than the motor vehicle which is the subject matter of the retail instalment sale (or accessories therefor or special or

_____

[11] *In re Graupner* was decided on December 21, 2006, only one day before *In re Peaslee*.

22

auxiliary equipment used in connection therewith)..." MVRISA §314.   UCC § 9-103 and any

statute so directly governing the formation of security interests in personal and real property as

MVRISA does can surely be deemed to have met the New York Court of Appeals' definition of

"statutes which relate to the same or to cognate subjects [and] are *in pari materia* and to be

construed together..." *See In re Plato's Cave Corp.*, 68 N.Y.2d at 793.  No intent to the contrary

was clearly expressed by the New York state legislature in the MVRISA.  Therefore, this Court

holds that the two statutes are *in pari materia*, and that the term "price," as used in New York's

UCC § 9-103, must be given the meaning set forth in MVRISA's definition of cash sales price,

which includes negative equity.

      As mentioned in the argument section, *supra*, the *Peaslee* court opines that "there does

not appear to have been a legal or equitable reason that Congress would have enacted a provision

that would transform knowingly refinanced unsecured negative equity debt into secured debt not

supported by collateral value, and then require it to be paid in full to the detriment of other

unsecured creditors..." *Peaslee*, 358 B.R. at 556.  The *Peaslee* court appears to offer this

statement as philosophical support for its conclusion that its interpretation of the hanging

paragraph is correct.

      This statement regarding the *Peaslee* court's inability to discern Congress' "legal or

equitable reason" for enacting the hanging paragraph is interesting for two reasons.  The first is

that in the very next paragraph the *Peaslee* court asserts that "any attempt to determine what the

intent of Congress was with respect to these negative equity roll-in and refinance transactions

would be absurdly speculative, since there is absolutely no legislative history..." *Id*. at 556.  If this

is so, the *Peaslee* court's attempt to infer anything from the lack of an apparent legal or equitable

reason for Congress' actions is equally "speculative."

Second, it seems obvious to this Court that the primary purpose of the hanging paragraph of Code §1325(a)(9) is, in fact, precisely to take the "unsecured negative equity debt" which any Chapter 13 debtor has when his or her less than nine hundred and ten day-old vehicle is not worth the outstanding loan balance, and, by refusing it the Code §506 treatment, to "transform it into secured debt not supported by collateral value, and then require it to be paid in full to the detriment of other unsecured creditors..." *Id.* The *Peaslee* court's distinction between this type of ordinary "unsecured negative equity debt" and what it chooses to call "knowingly refinanced unsecured negative equity debt" is a quizzical one. It could have as easily accused a debtor of knowing in advance that his recently financed vehicle would decline rapidly in value in the years immediately following its purchase, leading to what it could then characterize as a "deliberate" unsecured negative equity debt upon his filing a Chapter 13 bankruptcy, and treating same as unsecured debt in his Chapter 13 Plan, repayable at a fraction of the total amount due. The Bankruptcy Code makes no such distinctions.

### *Other Cases*

In *Snap-On Tools, Inc. v. Freeman* (*In re Freeman*), 956 F.2d 252 (11th Cir. 1992), the 11th Circuit Court of Appeals affirmed *In re Freeman*, 124 B.R. 840 (N.D. Ala. 1991), which involved the consolidation of several revolving accounts in which the lender had purchase money security interests in several discrete pieces of equipment. The district court examined whether a lender, who consolidated a borrower's debts in such a way that the purchase money security interest agreement (which also had an after-acquired clause) attached to $2,087.47 in collateral value to

secure an obligation of $1,643.00, was entitled to a purchase money security interest in that

collateral.[12]  The court held that

> [a] security interest in an item of collateral is purchase money to the extent the
> item secures a debt incurred to enable the debtor to make the purchase.  To the
> extent an item of collateral secures some other kind of debt, the security interest
> in an item is not purchase money.

*In re Freeman*, 124 B.R. at 842.

A similar case, cited by many decisions in this area, is *In re Manuel*, 507 F.2d 990 (5th Cir.

1975).  There the Fifth Circuit Court of Appeals addressed facts wherein a creditor consolidated

an existing purchase money obligation for the purchase of household furniture with a new loan

for a television set.  The court held that the security interest "was not a purchase money security

interest because it is not taken or retained by the seller of the collateral solely to secure all or part

of *its* price."  *Id*. at 993 (emphasis in original).  Clearly the price of original household furniture

was not part of the price of the television.

More importantly, each of these cases involved instances where there were several, or at

least more than one, individual pieces of collateral retained by the debtor.  This fact is central to

their holdings because of the issue as to the allocation of the security interests among the several

items of collateral possessed by the debtor.  These courts, like the Eleventh Circuit Court of

Appeals in *Freeman*, were clearly addressing an inherent unfairness to the debtor: a consolidation

leading to a creditor/seller having a purchase money security interest in several pieces of collateral

worth over $2,000.00 securing one debt of less than $1,650.00.  Obviously the debtor is put at a

---

[12] Until *In re Peaslee*, no court in the Second Circuit had cited to either *Freeman* decision.
In fact, even *Peaslee* cited *Freeman* only on the issue of whether to apply the Transformation or
the Dual Status rule to a "mixed" transaction, not the issue of whether or not a transaction was
"mixed" to begin with.

disadvantage under this scenario because every piece of collateral remains covered by the purchase money security interest until the one, consolidated debt is paid in full.[13]

However, in the instant cases, the exact opposite is true. The debtor retains only one item of collateral, his or her new car. And it is clear to the debtor exactly when the purchase money security interest will be released: when the total obligation is paid in full. United States Bankruptcy Judge Burton R. Lifland of the Southern District of New York touched on this point when he concluded that "a floating lien is inconsistent with a purchase money security interest because a purchase money security interest requires a *one-to-one relationship between debt and collateral*." *In re Ionosphere Clubs, Inc*. 112 B.R. 78, 83 (Bankr. S.D.N.Y. 1990) (emphasis added) (*citing Southtrust Bank v. Borg Warner* (*In re Southtrust Bank*), 760 F.2d 1240 (11th Cir. 1985). This is clearly a distinguishing factor. It becomes clear that it is the existence of other items of collateral which leads to a "mixed" transaction, not the existence of an additional debt component or expense (financed at the time of purchase), which, as we have seen, Comment 3 to UCC § 9-103 explicitly allows to be included in the "price" of the one piece of (purchase money security interest) collateral.

---

[13] The point was addressed in *In re Sprague*, 29 B.R. 711 (Bankr. M.D. Pa. 1983), *aff'd sub nom*. 742 F.2d 797 (3rd Cir. 1984). That decision held that the rule that there is no purchase money security interest if consumer goods secure any price other than their own and there is no formula for application of payments "*expresses a concern for determining at what point...a particular piece of collateral is released from the purchase money encumbrance* [and] *is predicated on the belief that if no sequence is provided for the release of the encumbrance in the individual items of collateral, the creditor will continue to retain a purchase money security interest in each item until the entire indebtedness is satisfied*." *Id.* at 712-13 (emphasis added). It is perhaps for this reason that cross-collateralization "has the detrimental effect of spoiling purchase money security interest status." *See In re Brookwood Sand & Gravel, Inc*., 174 B.R. 309, 314 (Bankr. N.D. Al. 1994). In fact, in New York, MVRISA § 314 effectively prohibits cross collateralization in any motor vehicle retail instalment contract.

26

A case mentioned by Debtors' counsel at oral argument is, on this basis, easily distinguishable. *In re Horn*, 338 B.R. 110 (Bankr. M.D. Ala. 2006) does indeed hold that the creditor's claim was "not a purchase money obligation because [the debtor] did not incur the entire debt as all or part of the purchase price of the [one] vehicle." *Id*. at 113. But the debt in *Horn* had been refinanced four times in the four years following the vehicle purchase, with the debtor being advanced additional funds ranging in amounts from $500 to $2,300 at the time of each refinancing. *See id*. at 112. The extent to which this type of financing arrangement differs from the instant cases and violates both the spirit and letter of UCC § 9-103's definition of "price" in the context of a purchase money security interest, as well as Comment 3 thereto, should require little explanation at this point.

The Court is willing to concede that had the creditors/sellers in the instant cases financed the new cars, paid out the trade-in loans, but allowed the debtors to retain the trade-ins and make payments on both vehicles under one consolidated debt to the creditors, the seller would not have a purchase money security interest in both vehicles. Judge Lifland's "one-to-one correspondence between debt and collateral" would have been lost.

**The Transformation and Dual Status Rules**

When an obligation is not entirely a purchase money obligation, usually because it has been secured by another item of collateral, the issue arises as to whether to apply the "dual status rule" or the "transformation rule."[14]

---

[14] UCC § 9-103(f) dictates that in non-consumer goods transactions, the purchase money security interest is not lost or destroyed, but remains on the purchase money security interest portion of the debt. In consumer transactions, however, UCC § 9-103(h) explicitly leaves to the

The "dual status rule" essentially "allows a security interest to have both the status of a purchase money security interest, to the extent that it is secured by collateral purchased with loan proceeds, and the status of a general security interest, to the extent that the collateral secures obligations unrelated to its purchase." *In re Ionosphere Clubs, Inc.*, 123 B.R. 166, 172 (S.D.N.Y. 1991).

On the other hand, the transformation rule holds that "when a transaction is 'mixed' or has both purchase money and non purchase money components, the entire transaction is transformed into a non purchase money transaction..." *In re Westfall*, 2007 Bankr. Lexis 989 *26 (Bankr. N.D. Oh. 2007).

This Court finds that the transactions in question are not mixed, but are entirely purchase money obligations pursuant to UCC § 9-103. As such, the issue of whether or not to apply the Dual Status or Transformation rule does not arise, and need not be addressed.

### *Summary*

The Court agrees entirely with the *Peaslee* court's comments regarding an increasing number of consumer debtors' difficulties being caused by "upside down" car loans, exacerbated by less than prudent negative equity roll-in financing. *See Peaslee*, 358 B.R. at 554. The Court even believes that enforcement of the holding in *Peaslee* would have a beneficial effect by discouraging such imprudent financing practices by auto lenders. More importantly, however, the Court agrees with the *Peaslee* court's comment regarding the "exercise of discretion by the Bankruptcy Courts" when it concludes that one of the purposes of the BAPCPA was to have those

courts the decision whether to apply the dual status or transformation rules.

courts "enforce various new [BAPCPA] provisions as written." *Id.* at 560. This Court has not

hesitated to interpret the provisions of BAPCPA "as written" even when such an interpretation

seemed to be at cross purposes with the intentions of the drafters. *See In re Rotunda*, 349 B.R.

324 (Bankr. N.D.N.Y. 2006). But the Court declines to gag at the gnat of a UCC ambiguity in

order to swallow whole a camel-like contravention of BAPCPA. This is especially so when New

York's MVRISA provides a means of construing the hanging paragraph of Code §1325(a)(9)

which is in harmony with the Code, UCC § 9-103 and New York's MVRISA.

Aside from the Court's difference of opinion with the reasoning in *Peaslee*, it believes that

a holding that "price" as set out in UCC § 9-102 includes negative equity (as does MVRISA's

definition of "cash sale price") serves the underlying purposes and policies of the UCC because

such a reading "permit[s] the continued *expansion of commercial practices* through custom, usage

and *agreement of the parties*." UCC §1-102(2)(b) (emphasis added).

Any concerns that the Court's ruling in this case will provide incentive for auto lenders

to finance ever larger negative equity balances into their new car loans, confident that in the

Chapter 13 environment their entire loan balance will be protected by the purchase money security

interest being retained, are misplaced.

This is because a Chapter 13 debtor has the option of surrendering the financed auto,

whereupon the lender may be required to accept the car in *full satisfaction* of that lender's claim,

with no unsecured portion of the claim to be paid through the plan.[15] The prospect of being

---

[15] *See In re Pinti*, 2007 Bankr. Lexis 744 *11-17 (Bankr. S.D.N.Y. 2007). In this well-reasoned decision, United States Bankruptcy Judge Cecelia G. Morris found the hanging paragraph applies whether the debtor retains the collateral under Code § 1325(a)(5)(B), or surrenders it under Code § 1325(a)(5)(C). As a result, because the hanging paragraph removes Code §506(a) from consideration, the 910 creditor's claim cannot be bifurcated, and "a 910

29

denied any claim for the rolled-in negative equity in the event the debtor chose to surrender the financed vehicle should provide a disincentive to auto dealers and lenders eager to provide ever larger negative equity balance financing to their buyers.

Because each of the Creditors in these cases possesses a purchase money security interest in the subject collateral pursuant to UCC § 9-103, the hanging paragraph of Code § 1325(a)(9) applies, and the Debtors are unable to "cram down" the Creditors' claims pursuant to Code § 506.

Based on the foregoing, it is hereby

ORDERED that Creditor Hyundai Motor Finance Co.'s objection to Chapter 13 Debtors Petrocci's plan is granted; and it is further

ORDERED that Creditor Nuvell Credit Corp.'s objection to Chapter 13 Debtor Cannon's plan is granted; and it is further

ORDERED that Creditor AmeriCU Credit Union's objection to Chapter 13 Debtors Delee/Graham-DeLee's plan is granted; and it is further

ORDERED that the Chapter 13 Plans of the Petroccis, Cannon and DeLee/Graham-DeLee are returned to this Court's Confirmation Calendar to be held at Utica, N.Y. on July 31st, 2007 at 2:00 PM for further proceedings.

---

creditor has no statutory basis to assert an unsecured claim after surrender of its collateral." *Id.* at 15. *Accord In re Osborn*, 2007 Bankr. Lexis 497 (8th Cir. B.A.P. 2007); *In re Roth*, 2007 Bankr. Lexis 1647 (Bankr. N.D. Ind. 2007), and *In re Bivins*, 2007 Bankr. Lexis 519 (Bankr. M.D. Ga. 2007). Those cases taking the contrary view acknowledge that they are in the minority. *See, e.g.*, *In re Clark*, 2007 Bankr. Lexis 590 * 11 (Bankr. N.D. Miss. 2007) (stating that "the court recognizes that the weight of authority is in favor of the debtors' position [that the hanging paragraph renders § 506 inapplicable to § 1325(a)(5) and the collateral can be surrendered in full satisfaction of the 910 creditor's claim]").

30

Dated at Utica, New York

this 20th day of June 2007

/s/    Hon. Stephen D. Gerling
STEPHEN D. GERLING
Chief U.S. Bankruptcy Judge